LYLE, SIEGEL, CROSHAW & BEALE, P.C., ETC.

V.

TIDEWATER CAPITAL CORPORATION

Record No. 940523

April 21, 1995

Present: All the Justices

*Henry H. McVey, III (Charles G. Meyer, III; McGuire, Woods, Battle & Boothe,* on briefs), for appellant.

*E.D. David (Kevin W. Grierson; Jones, Blechman, Woltz & Kelly,* on brief), for appellee.

JUSTICE STEPHENSON delivered the opinion of the Court.

In this appeal, we determine whether the trial court erred in (1) ruling, as a matter of law, that the plaintiff was not guilty of contributory negligence; (2) striking the defendant's evidence and entering summary judgment in favor of the plaintiff; (3) striking the defendant's expert testimony; (4) refusing to strike the plaintiff's evidence; and (5) making certain discovery and other evidentiary rulings.

## I

Tidewater Capital Corporation (Tidewater) sued the law firm of Lyle, Siegel, Croshaw & Beale, P.C. and its successor in interest, Croshaw, Siegel, Beale, Hauser & Lewis, P.C. (the Firm), for malpractice. At a jury trial, at the conclusion of the Firm's evidence, the trial court struck the Firm's evidence, entered summary

judgment in favor of Tidewater, and fixed damages at $2.4 million. The Firm appeals.

## II

Tidewater is a real estate investment company of which Lawrence R. Siegel was president, a director, and 50% shareholder. Siegel also was a partner in the Firm.

Galaxy-Wide Products, Inc. (Galaxy) is in the business of purchasing consumer contracts from companies engaged in door-to-door sales of products (primarily encyclopedias). After purchasing the contracts, Galaxy delivers the products and collects the installment payments.

In late 1988 and early 1989, Galaxy was seeking a loan to fund its purchase of contracts. During that time, Joseph B. Ketaner, Galaxy's chief executive officer, asked Siegel for assistance in locating a lender. Unable to find any other lenders, Siegel approached his fellow Tidewater directors and obtained authority to enter into loan negotiations with Galaxy.

In April 1989, Siegel drafted a proposed "term sheet" outlining the basic provisions of the loan. Tidewater's board of directors approved these terms, and Ketaner, for Galaxy, agreed to them. Thereafter, between May 1, 1989, and August 23, 1989, Tidewater disbursed to Galaxy a total of $2.5 million, consisting of 16 separate draws. The loan was secured by all of Galaxy's assets; however, the principal collateral consisted of Galaxy's consumer contracts.

Siegel instructed Laurie L. Dawson, a first-year associate attorney in the Firm, to draft the requisite loan documents and to ensure that Tidewater perfected a security interest in all of Galaxy's assets. Siegel requested two of his law partners, David N. Reda and Wayne G. Souza, to assist him in supervising Dawson's work. Reda and Dawson testified, however, that Siegel was in charge of the loan transaction and was responsible for reviewing all loan documents and for approving any substantive changes to them. Indeed, Siegel was both the "lead attorney" and the authorized representative of Tidewater in the transaction.

Prior to May 1, 1989, Siegel had reviewed copies of some of Galaxy's contracts that were "supposedly representative" of Tidewater's collateral. From this review, Siegel had concluded that the contracts were "accounts receivable." Thus, based on Siegel's conclusion and his instructions to other lawyers in the Firm, the law-

yers, *i.e.*, Dawson, Reda, and Souza, all understood that Tidewater held a security interest in Galaxy's accounts receivable.

Thereupon, Dawson took the necessary steps to perfect Tidewater's security interest in all of Galaxy's assets, including accounts receivable. She drafted the May 1, 1989 security agreement that accompanied the initial loan documents. Siegel reviewed and signed the security agreement as "President of Tidewater Capital Corporation." Dawson then filed the necessary financing statements with the State Corporation Commission and with the Circuit Court of the City of Virginia Beach. Code § 8.9-401. The Firm, however, never required Tidewater to take possession of any of the collateral.

On May 12, 1989, Siegel sent a memorandum to Stephen B. Sandler, a fellow Tidewater director, recommending that Galaxy sell $500,000 of its contracts to "Household Finance Corp. and/or Beneficial Finance Corp." at "approximately 88-90¢ per dollar." This, Siegel estimated, would generate about $440,000 for Galaxy's benefit.

Shortly thereafter, Siegel reviewed and signed in his capacity as Tidewater's president a security agreement dated May 17, 1989. Unlike the May 1, 1989 security agreement, the May 17 agreement allowed Galaxy to sell the loan collateral "in the normal course of business" and gave Tidewater a security interest in all "proceeds" from the sales of "accounts receivable." Siegel testified that he did not know how or why this change was made in the May 17 security agreement. Dawson and Reda also did not know how the change was made, and Souza also offered no explanation therefor. Dawson testified, however, that she would not have added the language "except upon the direction of [Siegel]," and Reda testified that Siegel always reviewed all documents and made changes in documents "all the time, even right up to closing."

A third security agreement was executed on July 27, 1989. It also allowed Galaxy to sell the collateral "in the normal course of business."

On July 21, 1989, Galaxy began selling its contracts to Beneficial Finance Corporation (Beneficial). In late August, David S. Rudiger, a member of the Firm, told Siegel that Tidewater needed to obtain physical possession of the contracts in case their characterization as accounts was incorrect and Galaxy tried to sell

them or filed for bankruptcy. Tidewater, however, took no action at that time.

On September 1, 1989, after all the funds had been disbursed, Tidewater and the Firm learned that Galaxy had sold some of its contracts to Beneficial, free of Tidewater's lien. On September 27, 1989, Tidewater declared Galaxy in default on the loan, and the Firm recommended that Tidewater file a detinue action to obtain possession of the collateral. Tidewater did obtain possession, but was required to post a $10 million bond. Faced with having $10 million of its cash tied up and possibly with a determination in Galaxy's threatened bankruptcy proceeding that it was unsecured, Tidewater settled with Galaxy in December 1989. By this time, Galaxy had sold collateral for approximately $1.1 million.

Tidewater then looked to the Firm to indemnify it against any losses it would incur. When it became apparent that the Firm was not willing to do so, Tidewater instituted the present action.

On March 13, 1989, Siegel, as Tidewater's lawyer, began recording his time in negotiating and structuring the business transaction between Tidewater and Galaxy. The fees charged by the Firm in connection with the transaction totalled $123,000. The Firm had been Tidewater's exclusive legal counsel from the time Tidewater was incorporated through the business transaction that is the subject of this litigation.

## III

The Firm contends that Tidewater's malpractice action is barred by its contributory negligence. The Firm asserts that, when Siegel engaged in loan negotiations, reviewed the loan collateral, and signed various documents as Tidewater's president, Siegel "acquired critical knowledge about Galaxy and the loan transaction during the scope of [his] agency with Tidewater" and that Siegel's actions are imputed to Tidewater. The Firm further asserts that Siegel, in his capacity as president and director of Tidewater, formulated the proposed loan structure and negotiated the terms of the loan "in an effort to forge a favorable business transaction acceptable to his corporation."

The trial court, in rejecting the Firm's contributory negligence defense, ruled that Siegel's actions and knowledge were not imputed to Tidewater. The court reasoned that "all of [Siegel's] actions in drafting legal papers, construing legal papers, giving legal advice, was as Siegel the lawyer, and not as Siegel the lender."

## A

■ Initially, we must decide whether the defense of contributory negligence is available in a legal malpractice action, an issue we previously have not addressed. We have recognized, however, that, in certain circumstances, contributory negligence may be a defense in a medical malpractice action. *See Eiss* v. *Lillis*, 233 Va. 545, 552-53, 357 S.E.2d 539, 543-44 (1987); *Lawrence* v. *Wirth*, 226 Va. 408, 412-13, 309 S.E.2d 315, 317-18 (1983).

In contending that contributory negligence is not available as a defense in a legal malpractice action, Tidewater relies mainly upon *Oleyar* v. *Kerr*, 217 Va. 88, 225 S.E.2d 398 (1976). In that case, we held that the statute of limitations applicable to contracts governed legal malpractice actions. *Id.* at 90, 225 S.E.2d at 400. We did not, however, consider whether contributory negligence was available as a defense.

■ Clearly, as *Oleyar* teaches, the attorney-client relationship is formed by a contract. Nonetheless, the duty upon the attorney to exercise reasonable care, skill, and diligence on behalf of the client arises out of the relationship of the parties, irrespective of a contract, and the attorney's breach of that duty, *i.e.*, the appropriate standard of care, constitutes negligence.

■ With respect to contributory negligence, we discern no logical reason for treating differently legal malpractice and medical malpractice actions. Both are negligence claims, and actions against attorneys for negligence are governed by the same principles applicable to other negligence actions. *See Allied Productions* v. *Duesterdick*, 217 Va. 763, 765, 232 S.E.2d 774, 775 (1977). Therefore, we hold that contributory negligence is available as a defense in a legal malpractice action.

## B

■ Next, we consider whether Siegel's knowledge and actions may be imputed to Tidewater. It is undisputed that Siegel acted in a dual role. He was a partner in the Firm, and he was president, a director, and 50% shareholder of Tidewater. Clearly, a jury issue was presented whether Siegel acted solely in his capacity as lawyer and whether his knowledge and actions may be imputed to Tidewater. Thus, the trial court erred in ruling otherwise.

■ We think, therefore, that, considering all the evidence and reasonable inferences deducible therefrom, a jury issue was pre-

sented whether Tidewater's claim is barred by contributory negligence.*

## IV

██ We now consider whether the trial court erred in striking the Firm's evidence and entering summary judgment in favor of Tidewater. It is firmly established that, in considering a motion to strike a party's evidence, a trial court must view the evidence and all reasonable inferences arising therefrom in the light most favorable to the nonmoving party. Also, any reasonable doubt about the sufficiency of the evidence must be resolved in favor of such party. *Rizzo* v. *Schiller*, 248 Va. 155, 157, 445 S.E.2d 153, 154 (1994).

██ If reasonable persons could differ about whether a party is negligent, then the issue is one of fact for resolution by a jury. *Litchford* v. *Hancock*, 232 Va. 496, 499, 352 S.E.2d 335, 337 (1987). Generally, expert testimony is required to establish the standard of care in "highly technical professions . . . unless the matters pertaining to the duty and the breach are obvious 'from ordinary human knowledge and experience.' " *Nelson* v. *Commonwealth*, 235 Va. 228, 236, 368 S.E.2d 239, 243 (1988) (architectural malpractice (quoting *Bly* v. *Rhoads*, 216 Va. 645, 650, 222 S.E.2d 783, 787 (1976))); *accord Rogers* v. *Marrow*, 243 Va. 162, 167, 413 S.E.2d 344, 346 (1992) (medical malpractice).

██ In the present case, Tidewater, upon which the burden of proof rested, presented expert testimony that the Firm breached the applicable standard of care. The expert, Daniel Gecker, testified that the Firm was negligent in treating Galaxy's contracts as accounts rather than as chattel paper or instruments. Gecker also opined that, assuming the contracts were actually accounts, the Firm's advice to Tidewater (*i.e.*, to consider itself unsecured if it was, in fact, properly secured) constituted negligence.

On the other hand, the Firm's expert, Ross C. Reeves, testified that the Firm conformed to the applicable standard of care because it followed the instructions of its client, Tidewater, which

---

* The Firm also contends that the trial court erred "in refusing to permit the jury to consider whether to limit Tidewater's recovery based on Siegel's alleged negligence." In view of our holding that a jury issue was presented whether Tidewater was contributorially negligent, our consideration of this contention is unnecessary.

advised the Firm to perfect a security interest in "accounts receivable." Reeves explained as follows:

> If the practitioner is told to get a lien on accounts, the practitioner's duty is to get a lien on accounts. And if there are a lot of accounts or a little accounts, it is not really the lawyer's obligation to determine whether or not that's the case. That's an underwriting decision. Someone in every transaction makes the loan and . . . decides whether this person has the character to pay, to be relied upon, whether this person is capable of repaying the money that's advanced to them and, ultimately, to the secured creditor, whether or not there should be collateral and what the collateral should be.
>
> If the lender decides it's going to be X, then it's going to be X; it's not the lawyer's job to say it ought to be Y.

From the evidence, the jury could have found that Siegel, while acting in his capacity as Tidewater's president, had instructed Laurie Dawson to perfect a security interest in "accounts receivable." Based upon the testimony of the Firm's expert, the jury then reasonably could have concluded that the Firm did not breach the applicable standard of care.

Consequently, given this "highly technical" area of the law and the conflicting expert evidence, a jury issue on liability was presented. We hold, therefore, that the trial court erred in striking the Firm's evidence and entering summary judgment in favor of Tidewater.

## V

The Firm also contends that the trial court erred in refusing to strike Tidewater's evidence, asserting that Tidewater based its entire theory of damages on testimony unsupported by the evidence. Tidewater developed its damage evidence by its expert witnesses, Nathan Benson and Bernard Korn.

Both witnesses established the value of what Tidewater had bargained for, *i.e.*, payment in full of its note, including interest, fees, and costs of collection. Benson then testified about Tidewater's position after collecting the contracts, paying the costs of collection, and paying the creditors who, due to the settlement, had become preferred over Tidewater. Benson opined that Tidewater incurred a loss of approximately $2.6 million.

■ There is no single measure of damages in a legal malpractice case, and, generally, the appropriate measure must be determined by the facts and circumstances of each case. *Duvall, Blackburn, Hale & Downey* v. *Siddiqui*, 243 Va. 494, 498, 416 S.E.2d 448, 450 (1992). In *Siddiqui*, we held that the proper measure of damages was the difference between the value of what the client bargained for and the value of what the client actually received. *Id.*

■ We think, based upon the facts and circumstances of the present case, that the proper measure of damages is the difference between the value of the collateral bargained for and the value of the collateral actually received. This was the basis of Tidewater's damage claim, and we conclude that the evidence presented by Tidewater's experts was sufficient, if believed by a jury, to support Tidewater's claim. Therefore, we hold that the trial court did not err in refusing to strike Tidewater's damage evidence.

■ We think, however, that the trial court was correct in striking the testimony of Patrick E. Corbin, one of the Firm's damage experts and a certified public accountant. Corbin testified that the proper measure of Tidewater's damages is the "lost investment opportunity" caused by Galaxy and the settlement. The Firm has cited no cases that have approved this measure of damages, and we have found none. As stated above, we do not think that the facts and circumstances of this case require a measure of damages that differs from the measure we previously have approved in legal malpractice cases.

## VI

The Firm challenges two rulings made by the trial court regarding two other expert witnesses.

## A

Reeves, the Firm's expert on the standard of care, sought to express his opinion about the nature of Galaxy's contracts held by Tidewater as collateral. The trial court, however, barred Reeves from testifying about the contracts.

The record discloses that Reeves had examined a substantial quantity of the contracts. Cover sheets, attached to the contracts, reflected the Firm's counsel's preliminary review and analysis of the contracts. Although Reeves informed the trial court that his

analysis was made independently of any review by the Firm's counsel and was based solely on the contracts themselves, the trial court concluded that Reeves was improperly influenced by what the Firm's counsel had placed on the cover sheets.

We think the trial court abused its discretion in refusing to allow Reeves to testify about the contracts. Reeves' qualifications were not challenged, and he was prepared to testify about a matter that was not within the range of common knowledge. Reeves stated unequivocally under oath that the notations on the cover sheets did not influence his analysis, and any influence upon Reeves went to his credibility as a witness and to the weight of the evidence, not to its admissibility.

## B

John Walston, another of the Firm's experts on damages, sought to express his opinion that Tidewater failed to mitigate its alleged damages in collecting its own contracts. Walston is experienced in the field of consumer account collections, and he would have testified to the reasonable costs of collecting a portfolio similar to the one collected by Tidewater.

Walston owns and operates three collection agencies and has been in the collection business for 25 years. He has received specialized education on how to collect accounts and has served as president of two state and one national collectors associations.

On voir dire, however, Walston stated that this was the first time that he had been engaged to testify as an expert. He also stated that he had had little experience in collecting on contracts similar to those in the present case. Further, in reaching his conclusions, he intended to rely on certain statistics, issued by a national collectors association, but he admitted that he was not sure whether the statistics were based upon the collection of contracts similar to those in the present case.

The trial court acknowledged that Walston may be an expert in certain types of collections. However, the court refused to qualify him as an expert in relation to the contracts involved in the present case.

The decision whether a witness is qualified as an expert is within the discretion of the trial court, and the trial court's decision in the matter will not be reversed unless it clearly appears that the court abused its discretion. *City of Fairfax* v. *Swart*, 216 Va. 170, 172, 217 S.E.2d 803, 805 (1975); *see Town & Country*

*Properties, Inc.* v. *Riggins*, 249 Va. 387, 398, 457 S.E.2d 356, 364 (1995) (this day decided). We do not think the trial court abused its discretion in refusing to qualify Walston.

## VII

Out of the jury's presence, Jonathan L. Hauser, a partner in the Firm, testified that, after the settlement agreement was reached between Tidewater and Galaxy, he was informed that Stephen Sandler, a Tidewater director, wanted to meet with him "to discuss the settlement of the claim." According to Hauser, he and Sandler "met a couple of times regarding settlement of the claim." Hauser explained their discussion as follows:

[Sandler's] position was that he wanted the firm to simply indemnify him from any loss or damage he might suffer as a result of that.

Our position was . . . that we had no problem dealing with him, but we did have a problem paying [Siegel] for his half of his own mistake and thought that was unfair.

And the settlement discussions sort of floundered for a bit on that subject, but we did reach a compromise. And, essentially, the compromise was that the law firm would admit to its negligence malpractice insurance carrier that it had made a mistake and would assert that position to its malpractice carrier.

In consideration of that, [Sandler] agreed that the damages that he suffered would be capped to $602,000, and that was the deal that we reached at the time. And that was the submittal that I made to the insurance company at the time. That's the long and the short of it, what it was all about.

Sandler's recollection of what transpired was rather vague. He did state, however, that he met with Hauser at Hauser's office "to find out whether or not Mr. Hauser planned on standing behind his mistake or not."

Over the Firm's objection, the trial court allowed the jury to hear the following:

Q. Mr. Hauser, there came a time in this matter that you represented to a third party that the firm had committed malpractice in this case, did you not?

A. Yes.

Q. And isn't it true that you were authorized on behalf of your firm to make that admission?

A. Yes, pursuant to my discussions with Mr. Sandler.

The Firm contends that the trial court erred in allowing testimony regarding Hauser's admission of negligence.
■ Generally, on public policy grounds, an offer to settle or compromise a disputed claim is inadmissible in evidence. *Brickell v. Shawn*, 175 Va. 373, 381, 9 S.E.2d 330, 333 (1940). However, an admission during settlement negotiations of an independent fact pertinent to a question in issue is admissible. *Id.* Similarly, an express admission of liability made during settlement negotiations is admissible. *Richmond v. Ewing's Sons*, 201 Va. 862, 870, 114 S.E.2d 608, 613 (1960).
Tidewater contends that Hauser's statement constituted both an admission of an independent fact pertinent to the question in issue and an express admission of liability. The Firm counters that "the settlement discussion between Hauser and Sandler never generated a 'direct admission' of liability, let alone some 'independent fact' pertinent to the question of liability."
■ We agree with the Firm. Our reading of the record simply suggests that the Firm, in an effort to settle the controversy, offered to admit to its insurance carrier that it was negligent. This was not an express admission of liability or the admission of an independent, pertinent fact. Therefore, the trial court erred in allowing testimony regarding Hauser's admission.

## VIII

Finally, the Firm contends that the trial court erred in refusing to require Tidewater to produce its tax returns for the years 1985 through 1992. The Firm asserts that it needed the returns in order to understand Tidewater's damage claim and to prepare a defense against that claim. The Firm also contends that it had no other way of validating Tidewater's alleged damages and asserts that the returns would show how Tidewater treated its alleged loss for tax purposes.
■ Rule 4:1(b)(1) provides, in pertinent part, that "[p]arties may obtain discovery regarding any matter, not privileged, which

is relevant to the subject matter involved in the pending action." The Rule further provides that "[i]t is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

We think the tax returns are discoverable because they are relevant to Tidewater's damage claim and are not privileged. Consequently, the trial court erred in denying the Firm's discovery request.

## IX

Accordingly, we will affirm in part and reverse in part the trial court's judgment and remand the case for a new trial.

*Affirmed in part,*
*reversed in part,*
*and remanded.*