# CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Mark K. Bunch

v.

Rhodes M. Artz, Jr.,
and Guy M. Aydlett

August 15, 2006

Case No. (Law) 04-2330

BY JUDGE MARK S. DAVIS

This matter comes before the Court on the motion of the plaintiff, Mark K. Bunch ("Bunch"), to quash the subpoena *duces tecum* issued by the defendants, Rhodes M. Artz, Jr. and Guy M. Aydlett,[1] to the Portsmouth Public Schools for the production of educational records of the plaintiff's mother, Chevaillette Bunch ("mother"). The parties appeared on June 28, 2006, for argument on the motion. The Court took the matter under advisement and ordered that the Portsmouth Public Schools produce the educational records for an *in camera* review. The factual and procedural background of the case, discussion of the issues, and conclusions are set forth below.[2]

---

[1] The original motion for judgment also named Higgins Realty, Inc., as a defendant, but that defendant was nonsuited by plaintiff pursuant to an Order entered June 16, 2005.

[2] Plaintiff is represented by Richard J. Serpe, Esq., Cindra M. Dowd, Esq., and Sherri L. Nelson, Esq., with the law firm of Glasser and Glasser, P.L.C., as well as O. L. Gilbert, Esq., with the law firm of Gilbert and Albiston, P.L.L.C. Defendants are represented by Richard A. Saunders, Esq., with the law firm of Furniss, Davis, Rashkind and Saunders, P.C.

## I. *Factual and Procedural Background*

Bunch filed his motion for judgment on November 12, 2004, alleging that Artz and Aydlett were owners of two separate residences where Bunch and his family lived in the City of Portsmouth from 1987 through 1999. Bunch also alleges that deteriorated lead paint was present at each of these residences during this same period and that such deteriorated lead paint constituted a health hazard. Bunch asserts that he "was lead poisoned" as a result of his exposure "to the high levels of lead in the deteriorating lead paint on the [p]remises." Bunch was born in 1986 and was therefore a minor at the time of the alleged exposure. Bunch alleges failure to abate/and or negligent abatement, violation of building and housing codes, violation of the Virginia Residential Landlord and Tenant Act, and common law negligence. He seeks compensatory damages of $8,000,000.00 and punitive damages of $350,000.00, plus interest, costs, and attorney's fees. Defendants filed a grounds of defense on January 11, 2005, generally denying the substantive allegations contained in the motion for judgment.

Defendants filed a "Motion to Require Plaintiff to Submit to Examination" on March 22, 2006. Among other things, defendants requested that plaintiff's mother, Ms. Bunch, provide "[e]ducational history of parents and siblings, and potentially other family members if there is a history of learning problems or special education." On April 4, 2006, the parties appeared for a hearing addressing several issues, including defendants' desire to ask plaintiff's mother, Ms. Bunch, questions regarding her educational background. Defendants asserted that they seek this information in order to assist their expert in determining whether any deficits the plaintiff may have are solely the result of lead poisoning or whether other factors, such as his mother's intelligence and education, are contributing factors. The Court heard evidence from defendants' expert pediatric neuropsychologist, Lawrence Charnas, M.D., Ph. D., who has a lead poisoning specialty, regarding the relevance of inquiring into the educational background of plaintiff's mother. Plaintiff's counsel indicated during argument that Ms. Bunch had answered several questions from plaintiff's expert regarding her education history. Because Ms. Bunch had answered questions about her educational background during such interview with plaintiff's expert, at the end of the April 4, 2006, hearing, the Court, rather than reaching the ultimate issue of discoverability of such information, ruled that Ms. Bunch had waived any objection she might have to answering similar questions from defendants and that fairness dictated

she provide a response to similar questions from defendants' expert. The Court entered an Order on June 28, 2006, memorializing its April 4, 2006, bench ruling.

On April 19, 2006, defendants' *counsel* issued a subpoena duces tecum to the custodian of student records for the Portsmouth Public Schools requesting production by May 10, 2006, of "[a]ll documents relating to Chevaillette Bunch" including her academic and scholastic records, intelligence test results, and standardized test scores. On April 28, 2006, the Court entered an agreed Order requiring that plaintiff undergo a neuropsychological evaluation on June 12, 2006, and that plaintiff's mother, Ms. Bunch, "attend the initial interview portion of the exam and respond to the questions that the Court previously allowed at the hearing held on April 4, 2006." On May 3, 2006, *plaintiff* filed a motion to quash the subpoena duces tecum issued by defense counsel for production of the educational records of Ms. Bunch. With the ultimate issue of discoverability squarely before the Court, argument on the motion to quash took place on June 28, 2006.

In the Memorandum in Support of Plaintiff's Motion to Quash and at oral argument, Bunch argued that his mother's educational records were confidential, privileged, not relevant, and/or not reasonably calculated to lead to the discovery of admissible evidence. Noting that defendants asked Ms. Bunch various questions regarding her educational background during her deposition,[3] plaintiff argued that "[d]efendants seek to invade more of Ms. Bunch's privacy by obtaining her complete academic file." Plaintiff goes on to argue that "[a]llowing [d]efendants access to Ms. Bunch's academic file is not only invasive, but could make discovery unending in trying to reveal any causal connection between Ms. Bunch's academic history and [plaintiff's] cognitive deficits." Plaintiff also argues that, once academic records are opened for discovery, medical and psycho-social life issues will have to be discovered in order to attempt to draw causal inferences. Relying upon *Van Epps v. County of Albany*, 184 Misc. 2d 159, 706 N.Y.S. 2d 855 (Sup. Ct. Albany County 2000), for support, plaintiff contends that such inquiries will make discovery unending, expensive, and extraordinarily oppressive and

---

[3] During her deposition, plaintiff's mother was asked whether she had indicated that she took special education classes when she took plaintiff to a particular clinic, and she said she did not remember ever taking any special education classes. She did state that she was moved by school officials to a vocational school after the eighth grade school year, and it was not her idea to move to that school. She also testified that she repeated the fifth grade and may have repeated the second grade, though she was not sure as to the latter.

abusive. Plaintiffs have also submitted an affidavit from their lead poisoning neuropsychological expert, Theodore Lidsky, Ph. D., who suggests that any correlation between a parent's intelligence quotient (IQ) and that of another child living in the family "is so weak as to lack predictive value." By stipulation, the plaintiff also relies upon testimony previously provided by John F. Rosen, M.D., a pediatrician and medical school professor specializing in lead poisoning cases, for the proposition that the educational background of a plaintiff's mother is virtually irrelevant to causation in a lead poisoning case.

Defendants respond that plaintiff claims he suffered a brain injury with resulting cognitive, behavioral, academic, and emotional deficits as a result of his exposure to lead paint. Defendants posit that they should be able to discover whether there are confounding variables to which the plaintiff's alleged cognitive deficiencies may be attributable. Defendants point out here, as they did at the April 4, 2006, hearing, that plaintiff's experts performed a neuropsychological evaluation upon the plaintiff and that plaintiff's mother provided information regarding her educational background for that evaluation. Defendants suggest that, since plaintiff's expert was permitted to inquire regarding the mother's educational background and since the plaintiff's experts point to the "absence of other factors that could explain the patient's deficiencies" in reaching their conclusions, they should be permitted to inquire further. Defendants' neuropsychological expert, Lawrence Charnas, M.D., Ph. D., suggests, among other things, that "reading and language disabilities are hereditable and are not associated with lead exposure." Moreover, when Dr. Charnas testified on April 4, 2006, in the initial hearing, he stated that factors all studies over the past twenty years have "controlled" for include maternal IQ. He specifically stated that it is important for a neuropsychologist to know whether a plaintiff's parent required special education because it may affect how the parent raises the child, and it can reveal genetic and environmental factors affecting the plaintiff child.

## II. *Discussion*

### A. *Standard Applicable to Motion to Quash*

Va. Sup. Ct. R. 4:9(c)(2), governing attorney-issued subpoenas to non-parties, provides that the Court "may quash, modify, or sustain the subpoena as provided above in subsection (c)(1) of this Rule."[4] Subsection (c)(1) of the

---

[4] The Virginia Supreme Court has "the authority to make rules governing the course of appeals and the practice and procedures to be used in the Courts of the Commonwealth, but such rules

Rule provides that a subpoena *duces tecum* may be issued to a non-party for items within the scope of Va. Sup. Ct. R. 4:1(b). Therefore, the general provisions from Va. Sup. Ct. R. 4:1(b) provide the outer limits of discovery on a non-party pursuant to an attorney-issued subpoena.

Va. Sup. Ct. R. 4:1(b)(1), in turn, provides that parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, including documents or other tangible things. The rule also provides that it is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Va. Sup. Ct. R. 4:9(c)(2) provides that, if the time for compliance with an attorney-issued subpoena *duces tecum* is less than fourteen days after service of the subpoena, then the person to whom such attorney-issued subpoena *is directed* may serve on the party issuing the subpoena a written objection setting forth any grounds upon which such production should not be had. If such an objection is made, the party issuing the subpoena is not entitled to production, and such production then may only be ordered if the issuing party timely moves for an order compelling production. With the objection and motion to compel before it, the Court may then quash, modify, or sustain the subpoena as provided in subsection (c)(2).

While a motion to quash under Va. Sup. Ct. R. 4:9(c)(1), and similarly an objection under Va. Sup. Ct. R. 4:9(c)(2), is facially akin to a Va. Sup. Ct. R. 4:1(c) motion for a protective order, the protective order provisions of Va. Sup. Ct. R. 4:1(c) do not apply to a motion to quash or objection under Va. Sup. Ct. R. 4:9(c). *Tonti v. Akbari*, 262 Va. 681, 686, 553 S.E.2d 769, 771 (2001). Only the non-party against whom disclosure is sought can prevent disclosure by "objection." There is no provision for a party to file an "objection." While the provisions of Va. Sup. Ct. R. 4:9(c)(2) could be clearer with respect to the remedies available to a *party* who wishes to object to an attorney-issued subpoena,[5] the only logical contextual meaning of the Virginia

---

shall not be in conflict with the general law as the same shall, from time to time, be established by the General Assembly." Va. Const., art. VI, § 5; Va. Code § 8.01-3(D).

[5] For example, unlike the corresponding Fed. R. Civ. P. 45(c) and (d) provisions, the Virginia rule only specifically addresses the situation where the time for compliance is less than fourteen days from service. Additionally, it does not specifically provide the opportunity for a party to file a motion to quash.

rule requires that the Court read it so as to incorporate the provisions of Va. Sup. Ct. R. 4:9(c)(1) permitting a *party* to promptly file a motion to quash or modify the requested production.[6] The federal courts that have applied the clearer provisions of the corresponding federal rule, Fed. R. Civ. P. 45(c), have recognized that the party to whom the subpoenaed records pertain cannot simply object, but that a protective order or motion to quash the subpoena is required. *See McCoy v. Southwest Airlines*, 211 F.R.D. 381, 384-85 (C.D. Cal. 2002). Since the Virginia Supreme Court has made it clear that the protective order provisions of Va. Sup. Ct. R. 4:1(c) are not applicable to a subpoena duces tecum issued for non-party records, a motion requesting one of the three Va. Sup. Ct. R. 4:9(c)(1) restrictions is the proper procedural remedy available to a *party* seeking to limit production pursuant to a subpoena duces tecum issued on a non-party.

Plaintiff filed the motion to quash the subpoena duces tecum. Therefore, the burden of persuasion on the motion to quash rests upon plaintiff. *See Goodwyn v. Bowden*, 32 Va. Cir. 330, 331 (Northampton County 1994); *see also Concord Boat Corp. v. Brunswick*, 169 F.R.D. 44, 48 (S.D. N.Y. 1996). Furthermore, to the extent that plaintiff relies upon privilege to support his motion to quash, the party seeking to establish the existence of a privileged communication has the burden of proving that the documents are in fact privileged. *Anderson v. Anderson*, 29 Va. App. 673, 681, 514 S.E.2d 369, 374 (1999).

## B. *Privilege*

As reviewed above, Va. Sup. Ct. R. 4:1(b), governing the scope of discoverable information, "authorizes exploration of any matter which is *not privileged* and which is *relevant to the subject matter* of the pending action." Kent E. Sinclair & Leigh B. Middleditch, Jr., *Virginia Civil Procedure*, § 12.2 (4th ed. 2003). As Professors Sinclair and Middleditch note in that same section of their text, when discussing these two principal tests governing discovery, "[t]hese are broad tests" and "[j]ust as in federal practice, information may be discovered, even if it will not be admissible at trial, so long as its disclosure may lead to the discovery of other, admissible evidence."

---

[6] It is arguable that the language in Va. Sup. Ct. R. 4:9(c)(2), providing that the court may quash, modify or sustain the subpoena as provided above in subsection (c)(1), only modifies the objection procedure outlined for subpoenas issued with a time for compliance less than fourteen days after service of such subpoena.

See *Turner v. Manning, Maxwell & Moore, Inc.*, 216 Va. 245, 253, 217 S.E.2d 863, 870 (1975). Therefore, where an assertion of privilege is made, the Court must first determine whether there is a privilege. Although the Rules of the Supreme Court of Virginia do not define the law of privilege under Virginia law, there are statutory privileges in Virginia, such as physician-patient, husband-wife, and priest-penitent. There are also non-statutory privileges such as those under the First Amendment to the U.S. Constitution, the attorney-client privilege, and the work product privilege. Sinclair & Middleditch, § 12.3. Plaintiff here contends that Virginia law and federal law establish the family's right to expect privacy in the confidential nature of their academic records, citing Va. Code § 22.1-287(A) and The Family Education Rights and Privacy Act of 1974, 20 U.S.C. § 1232(g). Plaintiff asserts that the expectations of privacy created by these statutes create a "privilege" that prevents disclosure in discovery of the educational records at issue here.

### 1. *Va. Code § 22.1-287(A)*

Va. Code § 22.1-287(A) provides that "[n]o teacher, principal, or employee of any public school nor any school board member shall permit access to any records concerning any particular pupil enrolled in the school in any class to any person except under judicial process unless" the person meets one of the statutory exceptions there listed. This statute provides protection to the records of a "pupil." The parties have not raised or addressed whether the educational records of a *former* student, such as Ms. Bunch, are covered by the prohibition of this statute. Therefore, assuming for this analysis, though not deciding, that "pupil" includes a former student, the Court first notes that the statute effectively places the burden to obtain appropriate judicial process upon the entity seeking such records. The defendants invoked such process by issuing a subpoena duces tecum,[7] and the plaintiff has sought protection from the Court asserting, among other things, that the documents are privileged from discovery.

The language of Va. Code § 22.1-287(A) provides for a general statutory ban on disclosure and publication of the covered information by those with responsibility for such records. Such "general statutory bans on publication do not bar limited disclosure in judicial proceedings, including court-supervised discovery." See *Laxalt v. McClatchy*, 809 F.2d 885, 888

---

[7] The parties have not argued, and the Court will not address, the question of whether an attorney-issued subpoena satisfies the "judicial process" provision of Va. Code. § 22.1-287(A).

(D.C. Cir. 1987). There are two factors that underlie this conclusion. First, full access by the courts and litigants to relevant information is "an important foundation for the achievement of justice by the courts in individual lawsuits." *Freeman v. Seligson*, 405 F.2d 1326, 1348 (D.C. Cir. 1968), *cited for proposition by Chaplaincy of Full Gospel Churches v. Johnson*, 217 F.R.D. 250, 258-59 (D. D.C. 2003), *overruled on other grounds by In re England*, 375 F.3d 1169, 1180-81 (D.C. Cir. 2004). Second, the purpose of statutory publication bans is not to prevent discovery, but rather to prevent the broadcasting of sensitive information to the general public. *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1343-44 (D.C. Cir. 1984). Additionally, courts have declined to infer qualified privilege from statutory publication bans given that, where legislatures have thought it necessary to protect against court use of records, it has expressly so provided by use of specific language. *Laxalt*, 809 F.2d at 889; *Marchese v. Secretary, Dept. of Interior*, C.A. No. 03-3082, 2004 U.S. Dist. LEXIS 20680, *13 (E.D. La. 2004). Instead, courts presume that legislatures will clearly and strongly indicate their intent to contradict the broad objective favoring disclosure in judicial proceedings, *particularly* where an act expressly permits court-ordered disclosure. *Laxalt*, 809 F.2d. at 889; *Friedman*, 738 F.2d at 1343; *Marchese*, 2004 U.S. Dist. LEXIS 20680 at *13-14.

Va. Code § 22.1-287(A) provides for a ban on publication of certain educational records by those responsible for the documents. The statute expressly permits court-ordered disclosure, and contains no specific language preventing use of such records in court proceedings.[8] Because the statute falls within the parameters outlined above and does not limit disclosure in court-supervised discovery proceedings, it does not create an evidentiary privilege. However, while the statute does not create a privilege, its provisions are directly relevant in determining the appropriate scope and manner of discovery, and those considerations are discussed in greater detail below.

## 2. *The Family Educational Rights and Privacy Act of 1974*

Plaintiff also contends that The Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g(b)(2) creates an expectation of privacy in the educational records at issue here. That statute provides that

---

[8] Va. Code § 8.01-581.17 provides an example of a Virginia statute that creates a privilege and contains specific language preventing disclosure of records during discovery in court proceedings absent a special showing.

"[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information, or as is permitted under paragraph (1) of this subsection unless . . . such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon condition that the parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency." Plaintiff has indicated that he obtained an authorization from Ms. Bunch to review the educational records at issue, though the extent to which Ms. Bunch is aware of the *in camera* production is not clear.

To the extent that plaintiff claims that this statute creates a privilege, the Court notes that in light of the general principles reviewed above regarding the creation of a privilege, this statute provides even less support for a privilege argument than the Virginia statute because it does not prohibit the disclosure of the covered information; it simply states that the federal government will not make funds available to responsible entities that fail to comply with the statute's privacy provisions. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 68 (1st Cir. 2002) (FERPA uses a carrot and stick approach to preventing disclosure). FERPA does not provide a general statutory ban on publication of the covered information, instead relying on the power of the purse to induce the desired behavior. Furthermore, the statute does not use the word "privilege" and it expressly permits court-ordered disclosure of such information. Accordingly, this Court must conclude that FERPA does not create a privilege that protects the educational records from disclosure during discovery. *E.g. Rios v. Reed*, 73 F.R.D. 589, 598 (E.D. N.Y. 1977) (while FERPA "does not provide a privilege against disclosure of student records," courts should weigh privacy interests against need for the information), 5-13 *Education Law* § 13.04(8)(c), Matthew Bender, 2006.

While FERPA creates no privilege, as with the Virginia statute's language discussed above, the language of FERPA *is* important in determining the appropriate scope and manner of discovery. *See DeFeo v. McAboy*, 260 F. Supp. 2d 790, 793 (E.D. Mo. 2003) (limitations FERPA places on educational institutions can be enforced by student seeking protective order preventing or limiting discovery). That being the case, the Court must revert to the general Virginia discovery standard in evaluating the plaintiff's motion to quash and determining the appropriate scope and manner of discovery. *See Ellis v. Cleveland Municipal School District*, 309 F. Supp. 2d 1019, 1022-24 (N.D. Ohio 2004) (disclosure of student records pursuant to discovery request does not violate 20 U.S.C. § 1232(g) as such compliance does not constitute a

policy or practice of disclosing student records FERPA was intended to prevent). However, before reaching the scope and manner question, the Court must evaluate whether the records are relevant.

## C. *Relevance*

In addition to arguing that there is a statutory privilege prohibiting disclosure in civil discovery of the educational records at issue, plaintiff argues that these educational records are not relevant, as that term is used in the discovery rules of Virginia. The general provisions governing discovery in Virginia are outlined in Va. Sup. Ct. R. 4:1. Va. Sup. Ct. R. 4:1(b)(1) requires that the discovery sought must be relevant to the subject matter involved. In the present case, the parties' experts disagree as to whether the educational records of Ms. Bunch are "relevant" to the subject matter involved, that is, in determining whether plaintiff's alleged cognitive, behavioral, and/or developmental deficits are the result of genetic inheritance, biological, or some environmental factors other than lead exposure at defendants' properties. Each of the parties has provided the Court with expert evidence supporting its position.

Professor Charles E. Friend, in his text *The Law of Evidence in Virginia*, 6th ed. 2003, helps clarify the meaning of relevance. He notes that:

> Evidence is relevant if it tends to establish the proposition for which it is offered. If it has *any* probative value, however, slight – *i.e.*, if it has any tendency whatsoever to prove or disprove the point upon which it is introduced – it is admissible. In fact, it is *not* admissible *unless it tends to prove a matter that is properly at issue in the case*. Evidence that relates to a matter that is properly at issue in the case is said to be material. Matters which have no logical bearing upon the case are said to be immaterial, and evidence tending to prove an immaterial matter is not admissible. Strictly speaking, therefore, evidence must be both relevant and material to be admissible, and it is inadmissible if it fails to satisfy either of these criteria. . . .
>
> Nevertheless, it is quite common for cases and treatises to combine these concepts by using the term "relevant" to describe evidence which (1) tends to prove a point which (2) is itself material to the case.

Charles E. Friend, *The Law of Evidence in Virginia*, § 11-1 (6th ed. 2003). Therefore, in Virginia, evidence is generally said to be relevant if it has any logical tendency, however slight, to prove a fact at issue in the case. *Clay v. Commonwealth*, 262 Va. 253, 257, 546 S.E.2d 728, 730 (2001). The criterion of relevancy is whether or not the evidence tends to cast any light upon the subject of the inquiry. *McNeer v. Greer-Hale Chinchilla Ranch*, 194 Va. 623, 629, 74 S.E.2d 165, 169 (1953).

Since the defendants' expert has testified that the educational records of Ms. Bunch could provide information that would tend to prove whether plaintiff's alleged lead poisoning and deficits are the result of genetic inheritance, biological factors, or some environmental factor other than lead poisoning, it is difficult to suggest that these educational records are *not* "relevant," *unless* some heightened relevance standard is applied. While plaintiff intends to present contrary expert evidence, the Court need not here determine whether such evidence from either side will be admissible at trial. *Turner*, 216 Va. at 253, 217 S.E.2d at 870 ("[e]vidence of post-accident design change was properly discoverable because that evidence, although inadmissible, was reasonably likely to lead to discovery of admissible evidence"). Having determined that no privilege attaches, the Court must determine whether such information is "relevant to the subject matter involved in the pending action," and meets the other criteria discussed below. This presents a two-step process. Once the Court has made the determination that there is no privilege and that the information is relevant and meets the other discovery criteria outlined below (the first step), the production phase follows with any appropriate limitations the Court may impose pursuant to Va. Sup. Ct. R. 4:9(c)(1) (the second step).

The Court now turns to an examination of the facts of this case and determination of whether the educational records are relevant. The educational records defendants' seek would, according to their expert, tend to establish the proposition for which they will be offered at trial. In other words, if the education records of the plaintiff's mother reflect information regarding her special education status and her IQ and if plaintiff has deficits, then defendants' expert neuropsychologist is prepared to testify as to the causative effect on plaintiff of those factors, versus any lead paint exposure. Indeed, defendants' expert, Dr. Charnas, testified, in addition to the opinions noted above, that lead poisoning is at the bottom of the list of factors affecting causation for a plaintiff's deficits. Plaintiff's own expert inquired into the educational history of Ms. Bunch in preparing his opinion, and later opined that "the mother's IQ for those [parents and children] . . . living together [accounts for about] 18% [of the child's IQ]."

Plaintiff relies upon decisions from other judges of this Court, as well as judges of other Virginia courts, for the proposition that circuit courts have granted motions for protective orders preventing disclosure of parents' academic records in similar lead poisoning cases. *E.g., Williams v. Griffin*, Law No. L01-307 (Portsmouth Cir. Ct. May 30, 2002); *Blackwell v. PRHA*, Law No. L98-681 (Portsmouth Cir. Ct. Aug. 5, 1999, bench ruling); *Cooper v. Penn*, Law No. L96-4595 (Norfolk Cir. Ct. September 21, 1999). None of these orders or transcripts of bench rulings provide a thorough analysis and explanation for the basis of such findings. Therefore, their benefit to this Court is limited.

Plaintiff also relies upon the New York *Van Epps* case for the proposition that a party seeking discovery of the educational records of a plaintiff's non-party parent must "offer testimony establishing that plaintiffs' objective clinical criteria and educational and social data, when evaluated within an expert context, is insufficient for defendants to determine the extent to which the adverse effects of lead paint exposure contributed to the infant's mental and physical condition." *Van Epps*, 184 Misc. 2d at 171, 706 N.Y.S.2d at 864. This is, in effect, a heightened relevance standard since it is a pre-production decisional test. The New York court's decision in *Van Epps* also suggests that, in order to sufficiently prove the *relevance* necessary to compel production of such educational records, the party seeking disclosure must meet a special "need" standard and show "how the specific information sought herein pertains to any disability or developmental impairment experienced by these plaintiffs." *Id.*

As the parties have here argued and as recognized in *Nieves v. 1845 7th Avenue Realty Associates*, 184 Misc. 2d 639, 642-43, 710 N.Y.S.2d 782, 785 (Sup. Ct. of New York County 2000), there are numerous decisions addressing this question that "rely on the identical legal principles in analyzing the issues on a case-by-case basis, but have split on the outcomes reached." The cases that permit disclosure of such educational information do not create a pre-production heightened relevance standard such as the one adopted by the *Van Epps* court, but instead utilize other production-related protective discovery tools such as *in camera* judicial review and confidentiality requirements. *See Anderson v. Seigel*, 255 A.D.2d 409, 680 N.Y.S.2d 587 (1998). Defendants rely on the lines of cases from New York that support production and are listed in the *Nieves* opinion. Defendants also rely upon *Mutz v. Whitehead*, Case No. CL 04024842 (Lynchburg Circuit Court, June 15, 2005) where the Court ruled, without discussion, that the defendants could obtain information regarding cognitive deficiencies of the infant plaintiff's immediate family. The Court has also reviewed two law review articles that

take opposing positions on this issue. One article takes the position that "[p]ermitting a plaintiff to allege that a defendant is the sole cause of his or her injury, but precluding the defendant from making a pertinent discovery of [educational] records, is a serious injustice to the defendant." Melissa E. Rosenthal, *Liberal Discovery of Non-Party Records: In Defense of the Defense*, 7 Cardozo Women's L.J. 59, 82 (2000). The other article takes the position that "courts should be extremely dubious of arguments that litigants need tests or personal records of persons other than the party claiming injury." Jennifer Wriggins, *Genetics, IQ, Determinism, and Torts: The Example of Discovery in Lead Exposure Litigation*, 77 B.U. L. Rev. 1025, 1088 (1997).

Having carefully considered all of the conflicting authority submitted by each party, the Court concludes that plaintiff's argument, that a party seeking such disclosure must meet a heightened standard of "relevance," is unsupported by any appellate authority from Virginia and is unpersuasive. While the Court recognizes that some courts outside Virginia have adopted a heightened relevance standard, whether explicitly identifying it as such as in *Volkswagen of America, Inc. v. Superior Court*, 139 Cal. App. 4th 1481, 1485 (2006), or implicitly as in *Van Epps*, the more persuasive approach applies the plain language of the general discovery standard contained in the rules of the Virginia Supreme Court, as Virginia's appellate courts appear to have done in other matters. *Thomas v. Commonwealth*, 44 Va. App. 741, 754, 607 S.E.2d 738, 744 (2005) (to be relevant to an inquiry, evidence need not conclusively prove the ultimate fact in issue, but only have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence), *see Laxalt*, 809 F.2d at 889-90; *Marchese*, 2004 U.S. Dist. LEXIS 20680 at *13-14. Such conclusion *does not* mean that the Court should ignore the privacy concerns of third parties such as Ms. Bunch in reviewing questions of disclosure; it simply means that a heightened standard of relevance is not the appropriate method of protecting such privacy concerns. Therefore, the Court concludes that the educational information sought by defendants is "relevant to the subject matter involved in the pending action."

D. *Reasonably Calculated to Lead to Discovery of Admissible Evidence*

Va. Sup. Ct. R. 4:1(b)(1) also provides that it is not ground for objection that the information sought in discovery will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Therefore, the Court must determine whether the information defendants seek appears reasonably calculated to lead

to the discovery of admissible evidence. *Lyle, Siegel, Croshaw & Beal, P.C. v. Tidewater Capital Corp.*, 249 Va. 426, 439, 457 S.E.2d 28, 36 (1995); *Owens v. Children's Hospital of the King's Daughters, Inc.*, 45 Va. Cir. 97, 101 (Norfolk Cir. Ct. 1997). As noted above, the defendants' expert has stated that the educational records of plaintiff's mother would assist him in excluding and weighing variables that may affect plaintiff's deficits. The Court cannot at this point find that any of the competing experts lack credibility. Since defendants' expert indicates such parental educational information is important to him in reaching his scientific conclusions, this Court must conclude that the discovery of such parental educational information is "reasonably" calculated to lead to the discovery of admissible evidence. For the same reasons expressed above, the Court will not create a heightened reasonableness standard any more than it will create a heightened relevance standard.

### E. *Unending, Oppressive, and Burdensome Inquiry*

Plaintiff further argues that the defendants' efforts to obtain these parental educational records will create unending discovery that is oppressive and burdensome. The plaintiff relies upon the *Van Epps* opinion for the proposition that a party seeking disclosure of a plaintiff's non-party parent/sibling educational records must demonstrate that disclosure "will serve to narrow and focus the scope of the litigation and aid in the resolution of the causality issue." *Van Epps*, 184 Misc. 2d at 172, 706 N.Y.S.2d at 865. At the pre-production phase of the discovery inquiry, such a test is nothing more than an effort to create a heightened standard of relevancy. This argument could be used to oppose discovery in any case by suggesting that obtaining additional information may only lead to additional questions. Of course, that is precisely the reason for discovery, to shed light on existing questions and lead to information that will help answer such questions. Inevitably, such discovery will sometimes raise additional questions. Any Court embarking on such an endeavor must concern itself with the *degree* to which such discovery will narrow and focus the scope of litigation. Premature narrowing of the scope of litigation will deprive parties of their right to defend themselves or to prove their case, while waiting too long will make litigation burdensome and may result in a prolonged process that unnecessarily intrudes into information of non-parties. The Court does not suggest that a court should ignore the degree to which requested discovery will narrow and focus the scope of the litigation. However, such a test should not be employed to prevent a party from meeting the Va. Sup. Ct. R. 4:1(b)(1) discovery threshold; it should be used to determine whether limitations should be placed on the production, such as *in*

*camera* reviews of documents, confidentiality requirements, or other protections against unnecessary disclosure. The Court finds that a threshold determination that defendants have met the Va. Sup. Ct. R. 4:1(b)(1) standard will not improperly strike that balance.

Because plaintiff's reference to production of these records as being "unduly burdensome" may be based upon Va. Sup. Ct. R. 4:1(b)(1)(iii), the Court will address that provision. As Professors Sinclair and Middleditch note in their text, the Virginia rules were amended around 1990 to adopt this provision from the federal rules. Sinclair & Middleditch, § 12.6. The same language was added to the federal rules by a 1983 amendment. In the committee note to the federal amendment, it is noted that the language of Fed. R. Civ. P. 26(b)(1) was added "to deal with the problem of over-discovery." Referring to the federal equivalent of the specific provision at issue here, Fed. R. Civ. P. 26(b)(1)(iii), the committee note said that the language was intended to "address the problem of discovery that is disproportionate to the individual lawsuit as measured by such matters as its nature and complexity, the importance of the issues at stake in a case seeking damages, the limitations on a financially weak litigant to withstand extensive opposition to a discovery program or to respond to discovery requests, and the significance of the substantive issues, as measured in philosophic, social, or institutional terms." 6-26 *Moore's Federal Practice – Civil*, § 26 App. 07 (2006). However, the thrust of plaintiff's opposition is not that the production of the records creates a financial or workload burden that is disproportionate to its benefit, but that it may lead to such an outcome in the *future*. Therefore, this provision is inapposite to plaintiff's current privacy argument.

F. *Limitations on Discovery*

Having determined that defendants' subpoena *duces tecum* meets the threshold requirements for discovery as set out in Va. Sup. Ct. R. 4:1(b)(1), the Court must now determine whether to limit such discovery pursuant to the provisions of Va. Sup. Ct. R. 4:9. While protections against disclosure, such as those in the Virginia and federal statute reviewed above, do not *bar* discovery, they *are* relevant in determining the manner in which discovery is conducted and what limitations, if any, should be imposed. *See Laxalt*, 809 F.2d at 889. Moreover, even absent statutes such as those discussed above, where sensitive private information of non-parties is sought in discovery, such considerations are relevant in determining the manner of production and potential limitations that may apply.

With respect to the Virginia and federal statutes discussed above, the interests protected by such statutory disclosure bans reflect a *legislative judgment* that certain categories of documents may contain sensitive data which warrants a more considered and cautious treatment. *Id.*[9] Therefore, in exercising its supervision of discovery of government documents in the course of civil litigation, a court "must accord the proper weight to the policies underlying these statutory protections and compare them with the factors supporting discovery in a particular lawsuit," thereby exercising its discretion under Va. Sup. Ct. R. 4:1 and 4:9 to undertake a substantive *balancing* of the need for disclosure against potential harm to the subject of the disclosure. *Id.* at 888-90. A court may then use traditional devices, such as *in camera* inspections and the specific Va. Sup. Ct. R. 4:9(c)(1) tools, to shape a discovery plan that will give effect to liberal discovery rules without threatening the interests protected by statutory disclosure bans such as the statutes involved here. *Id.* (noting that "the courts can limit . . . the persons having access to information, their freedom to discuss [that] information . . . and the uses to which the information may be put").

The Court is keenly aware that such educational records may contain privileged material or material that is not directly educational in nature. Therefore, the first step in protecting the privacy interests in such documents is to require production of the records for *in camera* review, as the Court has already ordered. *Anderson,* 255 A.D.2d at 410, 680 N.Y.S.2d at 589; *Caban v. 600 E. 21st Street Co.,* 200 F.R.D. 176, 183 (E.D. N.Y. 2001) (court should examine records in camera to determine their probative value and determine if they contain privileged medical information). Again, when conducting its *in camera* review, the Court must undertake the substantive weighing of competing interests by balancing the need for disclosure against potential harm to the subject of the disclosure. *Laxalt,* 809 F.2d at 888-90.[10] However,

---

[9] Plaintiff has not explicitly relied upon the Virginia Freedom of Information Act (FOIA), Va. Code § 2.2-3705.4, in support of his motion to quash. However, the Court notes that FOIA excludes from its public access provisions "scholastic records containing information concerning identifiable individuals," though such records "may be disclosed by the custodian in his discretion, except where such disclosure is prohibited by law." Such protection emphasizes the need to protect student records, while recognizing that they may be disclosed in certain circumstances.

[10] As the *Laxalt* Court noted, "[t]he need to balance conflicting interests is entirely different from the proposition we reject today – that merely because records are *subject to* the Privacy Act they are exempt in their entirety from civil discovery absent a specific showing of 'need'."

the outcome of that balancing cannot create a *prerequisite* to initiating discovery of such educational records, as plaintiff suggests. Instead, the outcome of the balancing assists the Court in "determining how to exercise its traditional authority to limit *disclosure*" methods after relevance has been determined. *Id.* at 889 (emphasis added).

Defendants have provided expert testimony regarding the need for discovery of the educational records at issue in order to exclude causes of plaintiff's deficits other than lead poisoning. In an effort to do so, defendants asked questions of Ms. Bunch, regarding her educational background that were similar to those asked by plaintiff's expert. When asked about a particular record produced in discovery that suggested she had participated in special education classes while attending the Portsmouth Public Schools, Ms. Bunch denied knowledge of having attended any special education classes. Additionally, the Court notes that the defendants are subjects of a lawsuit seeking in excess of $8,000,000.00. Therefore, there is a compelling argument for disclosure. On the other hand, disclosure of such educational records may reveal private information, including medical records, standardized test scores, IQ scores, grades, disciplinary records, etc. Accordingly, there is also a compelling argument for protecting such information from disclosure. It is for this reason that an *in camera* review is particularly helpful in fashioning an appropriate disclosure methodology.

The Court has reviewed the records produced and finds that they contain grade reports, standardized test results, telephone contact logs, audiometry reports, basic health information, medical and dental examination results, and physical fitness results. The Court previously held in this case that defendants were entitled to receive responses to questions regarding the medical information of Ms. Bunch where similar information was provided to plaintiff's experts. The presence of medical information in the Portsmouth Public School records of Ms. Bunch again raises the issue, but moves beyond the provision of information previously produced to plaintiff's expert. While defendants' subpoena *duces tecum* requested production of all records involving Ms. Bunch, the arguments regarding plaintiff's motion to quash focused on the "educational" records of Ms. Bunch, not medical records that just happen to be in her file. Additionally, having conducted an *in camera* review of such documents, the Court finds nothing in the medical records that directly relates to the intelligence or educational performance of Ms. Bunch. Therefore, the Court will "modify" the subpoena, pursuant to the authority granted by Va. Sup. Ct. R. 4:9(c)(1), as incorporated by Va. Sup. Ct. R. 4:9(c)(2), to exclude medical records

from production since the potential harm to Ms. Bunch would outweigh any need for such medical records (the audiometry reports, basic health information, medical and dental examination results, and physical fitness results).[11] The Court will place these documents in a sealed envelope indicating they should not be opened by any one other than a circuit court judge.

Because of the sensitive nature of the remaining non-medical information contained in these records, the Court will require that the documents be kept in the Clerk's office in a separate envelope indicating it is only to be opened in the manner described in this Opinion and Order; that they be available for inspection only to defendants, their attorneys of record in this case, and their experts; and that such defendants, their attorneys, and experts be prohibited from disclosing the contents of such records to any other persons or entities (with the exception of plaintiff, his attorneys and experts, and any judge, mediator, arbitrator, court reporter, or judicial personnel who may become involved in this litigation) unless directed or permitted to do so by a court of competent jurisdiction. The Clerk is therefore directed to seal these documents consistent with the Court's directive.[12] Finally, because it is not completely clear to the Court that Ms. Bunch has been provided with notice of this subpoena *duces tecum*, the Court orders that defendants have a copy of this Opinion and Order served on Ms. Bunch at least ten days before examination of her educational records by defendant, their attorneys, and/or experts; that a cover letter advise her that she has the right to object to such production; and that defendants file proof of such service with the Clerk for filing in this matter.

---

[11] Because of this limitation, it is unnecessary for the Court to determine whether Va. Code § 8.01-399 prohibits disclosure of the medical records in the file. It is also unnecessary for the Court to determine whether the Health Insurance Portability and Accountability Act (HIPAA), 42 U.S.C. § 1320d, *et seq.*, prohibits disclosure, 45 C.F.R. § 164.501; whether Va. Code § 22.1-287(A) covers such medical records; and, whether FERPA covers such medical records contained in a school's file, 20 U.S.C. § 1232g(a)(4)(B)(iv).

[12] The Virginia Supreme Court has recognized that pre-trial documents generated during discovery are not public components of a civil trial and a trial court may therefore place restrictions on their dissemination once they are filed with the court. *Shenandoah Publishing House, Inc. v. Fanning*, 235 Va. 253, 260, 368 S.E.2d 253, 256 (1988), *see* Va. Code § 8.01-420.01.

### III. *Conclusion*

For the reasons stated above, plaintiff's motion to quash is denied to the extent that such motion seeks a pre-production ban on disclosure and granted to the extent that it seeks modification of the subpoena *duces tecum* and limitations on the manner in which such information is disclosed. Since the parties have stated their positions in written briefs filed in this Court, the Court will dispense with the Va. Sup. Ct. R. 1:13 counsel endorsement requirement. The Court also orders the briefs of the parties filed. It is so ordered.