## Richmond

GEORGE J. TURNER v. MANNING, MAXWELL & MOORE, INC., ET. AL.

September 5, 1975.

Record No. 740608.

Present, All the Justices.

*Melvin I. Friedman* [*N.Y.*] (*Arthur B. Davies, III; Eric G. Peters; Kreindler & Kreindler* [*N.Y.*]; *Davies, Smith & Peters,* on brief), for plaintiff in error.

*Robert E. Glenn; S. J. Thompson, Jr.; Henry M. Sackett, III* (*Richard B. Kaufman; Mark E. Feldmann; Leighton S. Houck; Mosby G. Perrow, III; Eggleston & Glenn; Caskie, Frost, Hobbs & Hamblen; Edmunds, Williams, Robertson, Sackett, Baldwin & Graves,* on briefs), for defendants in error.

COCHRAN, J., delivered the opinion of the court.

On September 19, 1969, George J. Turner, an employee of Glamorgan Pipe and Foundry Company, in Lynchburg, was seriously injured when he was struck on the head by a hoist which became disengaged and fell while being operated by two of his fellow employees.

Turner filed an amended motion for judgment for damages against the manufacturer, Manning, Maxwell & Moore, Inc. (Manning), its successor, Dresser Industries, Inc. (Dresser), and a distributor, Barker-Jennings Corporation (Barker), alleging negligent design, manufacture, inspection, testing and sale of the hoist by Manning, negligent failure to warn of known dangerous characteristics of the hoist by Manning, Dresser and Barker, and breach of warranties of fitness, safety and merchantability by Manning and Barker. Each defendant denied liability, and, after pre-trial proceedings had been concluded, a jury trial was held.

At trial motions to strike the plaintiff's evidence, made at the conclusion of such evidence, were denied, but, when renewed at the conclusion of all the evidence, were granted. In sustaining the motions, the trial court ruled that Turner had failed to prove negligence in the design and manufacture of the hoist, that he had failed to prove that the hoist was dangerous for its intended use at the time of its purchase, so that there was no duty to warn, and that he had failed to prove breach of any implied warranty of merchantability or fitness. Turner, assigning numerous errors, has appealed the final order entered February 28, 1974, awarding judgment for the defendants. The defendants have assigned various cross-errors.

At the time of the accident, Turner was working in a cupola, a cylindrical structure lined with brick in which scrap metal is melted. This cupola and another that stands beside it are used on alternating days, so that one may be used while the other is being cleaned. There is a hole in the floor of the cupola through which the molten metal flows. Metal doors, weighing more than 800 pounds, in the bottom of the cupola, are dropped down to permit coke and other debris to fall out after the melting operation has been concluded for the day. Occasionally, a "freeze-up" occurs when the molten metal bundles cool and fuse to each other or to copper nozzles which extend into the cupola. At such times the cupola is shut down and cooled, and workmen then enter and break loose and remove the fused metal.

In 1960 Glamorgan began to use a "Budgit" portable half-ton capacity electric hoist, weighing 75 pounds, for the purpose of closing the doors in the bottom of the cupola. The hoist was moved from one cupola to the other and received such rough treatment that another was purchased in 1962, in order that one would be regularly available while the other was being repaired.

On the day of the accident, Turner and two other Glamorgan employees, James Torrence and Jack Williams, were sent to clean up the cupola where a freeze-up had occurred the preceding night. Torrence was stationed at the top of the cupola to activate the hoist. Turner and Williams were below him, in the cupola, attempting to move blocks of iron and bundles of compressed scrap metal. They took turns hooking the lower hook of the hoist into a crack or crevice of the metal or under a bundle of material and signaling Torrence to activate the hoist so that the metal could be lifted and removed through the hole in the floor. The upper hook, by which the hoist was suspended from a swinging arm or boom, was "open-throated", that is, it had no safety latch across its mouth. As Turner

stood on a ladder, Williams attached the lower hook to one of the blocks of metal and gave the signal to lift. Torrence activated the hoist. Immediately thereafter, Turner was injured when the lower hook broke through or slipped off the metal, thereby dislodging the hoist from its boom.

At trial, Turner adduced evidence from which the jury could have found that the hoist which fell on Turner was manufactured by Manning and purchased by Glamorgan in 1960 from Barker. We will assume, without deciding, that the trial court correctly ruled that Manning, a New Jersey corporation dissolved in 1964, was properly before the court, and that Dresser, which had acquired the assets of Manning in 1964, had assumed any products liability of Manning to Turner.

Turner called as an adverse witness Howard C. Stevens, Jr., Dresser's Chief Engineer for Hoist Products, who had previously been employed as an engineer by Manning. Stevens testified that it was possible for an open-throated upper hook to disengage accidentally from its support if the load on the lower hook was suddenly released, causing "some fantastic backlash." He further testified, however, that it would take "many, many times" the rated capacity load of 1000 pounds to cause this kind of backlash; that there was only a "very remote" possibility of this occurring; and that it could not occur under normal use of the hoist.

The uncontradicted evidence shows that until the date of the accident, and for some time thereafter, the open-throated hook was standard equipment on the Manning hoist, but that at least as early as 1958 Manning began to offer upper and lower hooks with safety devices as optional items at an additional charge of $1.60 each.

Turner undertook to prove, through his own testimony and that of his witnesses, Willis Driskill, James Vest and James Torrence, that the metal to which Williams attached the lower hook was loose and not frozen. Thus, Torrence, while declining to testify that the metal was not frozen, asserted that the hoist "moved the bundle and the bundle twisted." Driskill, Turner's foreman, testified that the bundles (engine blocks, car bodies, and pig iron) in the area of the cupola where Turner was injured were not frozen together. However, he admitted that he had sent Turner to the cupola to clean up a freeze-up, a condition which he defined generally as "just one mass of iron", and that some of the metal could have been "frozen together or melted together." Vest, Glamorgan's Melting Superintendent, testified, directly contrary to his testimony given in discovery depo-

sition, that the hoist was not used to free frozen metal. He conceded that the bundles of metal in the cupola could have weighed as much as 800 pounds each.

Turner testified that the metal in a freeze-up is generally "stuck together"; that, when the hoist would not pull the metal loose, if the metal "didn't break, you just quit and try to hook somewhere else"; and that, when he went into the cupola, there were metal blocks and bundles of compressed scrap metal partially melted and sticking together. He further stated that Williams attached[1] the lower hook to a "pig", which Turner described as a bundle of compressed metal weighing 300 to 500 pounds, and signaled to Torrence to activate the hoist. Although he testified that the metal block was "stuck", Turner maintained that "it moved" and the lower hook "slipped off", a statement apparently in conflict with his testimony in a discovery deposition that the "piece of iron . . . wouldn't give." Turner admitted, however, that his memory was probably clearer when he testified on deposition. Moreover, at trial, Turner explained:

"A.  I didn't mean the whole big piece come up, but a small piece of the bundle, just a small piece, not the big piece.

"Q.  When it came a loose, then the hook slipped off?

"A.  The hook slipped off.

"Q.  And that's when the hoist['s upper hook] disengaged, is that correct?

"A.  Yes, sir.

\*    \*    \*

"Q.  The whole block didn't move, but the piece you had it hooked to broke?

"A.  Yes, Sir."

Regardless of which version is accepted, Turner's testimony establishes that the hoist was being misused at the time of the acci-

---

[1] Turner noted that the method used to attach the lower hook to the metal bundles was to stick the point of the hook under the bundle or to "find a notch or place in a piece of iron and . . . hook it."

dent. Whether or not the metal moved, it was, by his testimony, "stuck", so that it must have been frozen, at least in part, either to the cupola or to other metal. Turner is bound by this testimony. *Watson & Chalk* v. *First Nat. Bank*, 213 Va. 687, 689, 194 S.E.2d 749, 751 (1973); *Massie* v. *Firmstone*, 134 Va. 450, 114 S.E. 652 (1922).

Charles J. Manney, a mechanical engineer presented by Dresser as an expert on hoists, testified without contradiction that use of the hoist to dislodge frozen metal was misuse because the weight of the load was unknown and might exceed the capacity of the hoist, and the attachment of the lower hook to the load was insecure. He further testified that there is no danger of disengagement when the hoist is suspended from an overhead support by an open-throated hook; that the one-half ton Budgit hoist, with an open-throated hook suspended from a secure support, is reasonably safe for the purpose for which it was intended; and that from 1943 until the date of the accident, the accepted standard applicable to the hoist industry was American National Standard B30.2-1943, which did not require safety latches on hooks.

Manney and Stevens testified that prior to the accident it was the industry custom to offer this kind of hoist with open-throated hooks as standard equipment and safety hooks as optional equipment. Manney also testified that he had never known a hoist of this kind to disengage accidentally so that he did not "consider it to be a remote possibility."

Harold E. Riem, president of a company that sells industrial safety equipment, testified as a witness for Turner. Riem testified that in 1954 and 1955 he had attempted to sell a new Bullard-Vernon safety hook to Manning; that he had told the Manning representatives that the purpose of the upper safety hook was to prevent disengagement as there was always a possibility of a hoist being dislodged "in some way"; and that he had never personally known of a hoist falling but he had been told "that hoists do fall."

We do not attach the significance to Riem's testimony that Turner urges. Riem was interested in selling safety equipment. His hearsay testimony about hoists falling is of no probative value. Hoists fall for many reasons. Indeed, Turner's witness, J. W. Dowdy, testified that on two occasions a hoist had been damaged when dropped through a cupola by Glamorgan employees.

There was no evidence of negligent design of the hoist. The jury could reasonably have concluded from the evidence that if the hoist

There was no evidence of negligent design of the hoist. The jury could reasonably have concluded from the evidence that if the hoist had been equipped with an upper safety hook the accident would not have occurred. This is not sufficient to impose liability. The manufacturer is not an insurer and is not required to design and market an accident-proof product. *Warner* v. *Kewanee Machinery & Conveyor Company*, 411 F.2d 1060, 1066 (6th Cir. 1969), *cert. denied*, 398 U.S. 906 (1970); *Evans* v. *General Motors Corporation*, 359 F.2d 822, 824 (7th Cir. 1966), *cert. denied*, 385 U.S. 836 (1966). The manufacturer is under a duty to exercise ordinary care to design a product that is reasonably safe for the purpose for which it is intended. 1 *L. Frumer & M. Friedman, Products Liability* § 7.01(1) (1975). There was no evidence on which a jury could have relied to find that the hoist in this case was not reasonably safe for its intended use. Moreover, the evidence showed that there was no need for an upper safety hook if the product was used for its intended purpose. It was the unforseeable misuse of the hoist, not the absence of an upper safety hook, that caused the accident. *See Brown* v. *General Motors Corporation*, 355 F.2d 814, 820 (4th Cir. 1966), *cert. denied*, 386 U.S. 1036 (1967).

There was evidence that the custom of the hoist industry was to offer hoists without safety hooks. Such evidence of industry custom does not establish conclusively that due care was exercised. *Bly* v. *Southern Ry. Co.*, 183 Va. 162, 172-74, 31 S.E.2d 564, 569-70 (1944). However, such custom or usage may be conclusive when there is no evidence to show that it was not reasonably safe. *C. & M. Promotions* v. *Ryland*, 208 Va. 365, 368, 158 S.E.2d 132, 134-35 (1967); *cf. Reed* v. *Carlyle & Martin, Inc.*, 214 Va. 592, 595, 202 S.E.2d 874, 877 (1974). In the present case there was no evidence that the industry custom was not reasonably safe. Furthermore, there was the testimony of Stevens and Manney that the hoist with the open-throated upper hook was reasonably safe for its intended purpose. We hold as a matter of law that the manufacturer here is not liable in tort for Turner's injury.

Turner's theory of implied warranty must also fail. There was an implied warranty of merchantability that the hoist was reasonably safe for its intended use when it was placed in the stream of commerce. Evidence that a purchaser ordered a product for a specified

purpose and relied on the manufacturer's judgment to supply a product suitable for the purpose would present a jury issue as to breach of warranty of fitness for that purpose. *See Carney* v. *Sears, Roebuck and Co.,* 309 F.2d 300 (4th Cir. 1962). There was no such evidence here. There was nothing more than an implied warranty of general merchantability applicable when the product is being used in the manner intended for it. The implied warranty does not apply when the product is being used in a manner or for a purpose for which it was not intended. *Layne-Atlantic Co.* v. *Koppers Co.,* 214 Va. 467, 473-74, 201 S.E.2d 609, 614 (1974).

Turner contends that Manning and Dresser were negligent in failing to give adequate warning of the dangerous characteristics of the hoist. We do not agree. There is evidence that the hoist may have been first used by Glamorgan on a trolley, from which the upper open-throated hook could not have been disengaged. The availability of the optional safety hooks was publicized by Manning, and the advisability of using such hooks in certain situations was made known in Dresser literature issued to Barker and distributed by Barker to Glamorgan before Turner was injured. Moreover, a sales brochure published by Dresser in 1966, introduced into evidence as Plaintiff's Exhibit No. 13, contained the following warning:

"CAPACITIES
"In determining hoist capacity required always anticipate maximum loads and order hoist with capacity exceeding heaviest load to be lifted. Never overload a hoist."

In a 1968 Dresser catalogue, the following warnings appeared:

"NEVER OVERLOAD A HOIST beyond its rated capacity.
"WHEN LIFTING LOAD make certain it is free to move and will clear any obstructions."

These warnings were disseminated after the sale of the hoist but before the accident.

It is unnecessary to decide whether, as Turner argues, a jury could have found that the warnings were inadequate. As the evidence shows that the hoist was reasonably safe for its intended purpose or for some other reasonably foreseeable purpose, but that it was being misused at the time of the accident, we hold that there was no duty to warn. *See Smith* v. *United States,* 155 F. Supp. 605 (E.D. Va. 1957).

■ Turner has assigned error to the trial court's ruling that evidence was inadmissible to show that Dresser and other manufacturers made safety hooks standard equipment in 1971, following the 1969 accident in question. We have long held that evidence of post-accident change of conditions is inadmissible to prove negligence. *Whitten* v. *McClelland*, 137 Va. 726, 120 S.E. 146 (1923); *Va., &c. Wheel Co.* v. *Chalkley*, 98 Va. 62, 34 S.E. 976 (1900). The public policy underlying the rule is that safety improvements should be encouraged, and if evidence of such improvements were admissible against the person making them, he would be deterred from doing so. *McCormick, Evidence* § 275 (2d ed. 1972).

Turner argues that evidence of the post-accident change in design was admissible for other purposes than to show negligence, and that such evidence was proper to show the practicality of the change and to rebut the evidence that the hoist without the safety hook was safe. There was evidence in the record that the hoist could be equipped with a safety hook at a cost to the manufacturer of only 55 cents and a slight additional charge to the customer. There was, then, no question as to the practicality of making it standard equipment. To admit evidence of post-accident change of design in order to rebut the evidence that the open-throated hook was safe, as some courts have ruled, would be to approve what we believe to be an unjustified exception to the rule of exclusion. We find no error in the trial court's refusal to admit the proffered evidence.

■ Nevertheless, we agree with Turner that the trial court erred in refusing to permit him to elicit by pre-trial discovery evidence of the post-accident change of design. Rule 4:1(b)(1) authorizes extensive discovery of information inadmissible in evidence "if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Evidence of post-accident design change was properly discoverable because that evidence, although inadmissible, was reasonably likely to lead to discovery of admissible evidence. The error was harmless, however, because the admissible evidence, knowledge by Manning and Dresser of prior accidental hoist disengagements, to which the inadmissible evidence would have led, was discoverable directly. The record does not show that the evidence which Turner sought unsuccessfully to discover would have led to any other admissible evidence.

■ Turner challenges the action of the trial court in refusing to permit the plaintiff to recall Stevens as a witness after the defendants had rested. Turner sought to question Stevens about letters patent

issued to Stevens pursuant to a 1968 application containing statements tending to show that he recognized that hoist operators frequently loaded hoists in excess of their capacity. It is unnecessary to decide whether such evidence would have been admissible. Stevens had testified twice at considerable length, first when called as an adverse witness by Turner, and then when called as a witness by Dresser. Turner therefore had been afforded ample opportunity to cross-examine Stevens extensively, and the trial court, in the exercise of its discretion in conducting the trial, did not err in refusing to permit him to be recalled for additional questioning.

We find no merit in Turner's other assignments of error. After a careful review of the record we hold that the trial court committed no reversible error in any of the rulings challenged by Turner. Our view of the case makes it unnecessary to consider the assignments of cross-error.

For the reasons assigned the judgment order of the trial court is

*Affirmed.*